GRACEY, JUDGE:
Claimant, L.R. Skelton & Company, a contractor of Columbus, Ohio, filed this claim seeking $368,955.82 additional compensation on the performance of its contract with the respondent, the Department of Highways.
Claimant was the low and successful bidder, and was awarded a contract in the sum of $634,726.00 for the repair of Slide No. 1995 on Riverside Drive, designated County Route 40, near Grafton in Taylor County. The contract was awarded October 31, 1980, and called for completion of the work by November 27, 1981. The slide was over 400 feet long, a section of both lanes of the two-lane highway slipping toward the river on the downhill side. The respondent’s Materials Control, Soil and Testing Division designed the repair plan, under supervision of Rex C. Buckley, a geologist. Thirteen test borings were *276 made to determine the nature of the soil, the top level, and the nature of the subsurface rock. The repair plan and contract included the installation of a row of 144 vertical steel I beam pilings, three feet apart on center. One-third of the total length of each piling beam was to be set into subsurface rock, a minimum of ten feet. The holes, to be drilled for the placement of each piling beam, were to be large enough in diameter to allow the beam to be lowered into the hole by its weight. Generally, these holes were 24 inches in diameter, and had to be about 45 feet deep, below the surface. Grout was used to hold the beams in proper position and alignment.
The test borings were illustrated on the contract plans, showing the elevation of the top of the subsurface rock. The symbol “MH” was shown to indicate that the rock was medium hard. Mr. Buckley testified that his classification was made by the driller, and represented a resistance to drilling; that the classification was not based on the Piteau Classification method not then in use in the division. The Piteau Classification method inolves a compression testing, rock being classified, as to hardness, after determination of the pressure required to break it. The test borings were about 4 inches in diameter, using an auger drill through soft materials, then a spoon to determine hardness of the rock, and then a core barrel to drill into the rock. Only one test boring went to a depth of 10 feet into rock, the others being only 5 feet deep into rock. The plans did not reveal the type of drilling equipment used.
After being awarded the contract, the claimant, not having adequate drilling equipment, subcontracted the drilling to E. J. Koker and Company, another Ohio firm having considerable drilling experience and equipment. No test drilling was done, before bidding, by the claimant, nor by E.J. Koker and Company before entering into the drilling subcontract. They both relied on the medium hard rock classification shown on the plans. Section 105.2 of the West Virginia Department of Highways Standard Specifications Roads and Bridges Adopted 1978 included the statement:
“The Contractor is not bound to accept or rely on the data shown on drawings, but may make such additional borings and investigations, including test piles, as he may desire in order to satisfy himself concerning the lengths of piles and the conditions governing or entering into the construction of foundations.”
In the General Notes, appearing on page 4 of the drawings, appears the statement:
*277 “The contractor shall satisfy himself that his equipment can obtain satisfactory penetration into the rock stratum a depth equal to 1/3 the total length of the pile to be installed.”
Respondent contends that the claimant was' remiss and negligent in not making its own test borings before bidding; that E.J. Koker and Company should have made its own test borings before entering into its drilling subcontract.
Claimant contends that such contractor test borings are not economically feasible; that there is no way to recover such costs if the contract is not awarded to it. Claimant relies on Section 104.2 of the aforementioned Standard Specifications, which provides in part:
“Should the Contractor encounter or the Department discover during the progress of the work subsurface or latent physical conditions at the site differing materially from those indicated in the contract, or unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract ... an equitable adjustment will be made and the contract modified in writing accordingly.”
This Section requires contractor notice in writing to the Engineer, and an Engineer finding that the conditions do materially differ.
Work began in December of 1980 after a November 13 preconstruction meeting. The work was shut down in February when, the contractor contends, hard rock was encountered, rock so hard that it could not be drilled with normal drilling equipment. Larry Koker, president of E.J. Koker and Company, related the twenty-five years’ experience of his company in performing drilling contracts, some 3,500 jobs. In pricing the subcontract at $19.00 per lineal foot, his company had relied on the medium hard rock classification shown on the plans, and he had been confident that a rock auger type drill bit could be used. When extremely hard rock was encountered, he had difficulty finding equipment which would penetrate it. When work resumed, in May or June of 1981, the rate of drilling was much slower than the fifteen or more feet per hour he had expected. Joint Exhibit No. 25, being a summary prepared from Koker drilling logs on 101 of the 144 holes, illustrated a drilling rate of 18.1 linear feet per hour on 2,494.6 feet of dirt and shale, and 2.2 linear feet per hour on 1,113.1 feet of hard and very hard rock. Joint Exhibit No. 15a, being excerpts from respondent’s construction drilling logs, show that 732.04 linear feet, or *278 63.7% of 1,140.35 feet of rock drilling, was marked “Hard”.
James W. Mahar, a Geotechnical Consultant presented as an expert witness by claimant, was of the opinion that no pre-bid or pre-contract boring by the claimant or Koker would have been recommended by him had he been consulted; that the respondent’s exploratory work was adequate. Upon his employment, he had reviewed the records and had supervised five exploratory borings. He discussed the Piteau Rock Classification system developed in the early 1970’s, and methods of drilling.
The Court is satisfied, from the evidence, that much of the rock encountered was hard rock, somewhat harder and more costly to drill than the medium hard rock indicated by the plans. Although a contractor is not bound to accept or rely on the data shown on the contract drawings, it is the opinion of the Court that a contractor is privileged to do so, and is entitled to an equitable adjustment where the data is erroneous or incomplete and different, more costly, conditions are encountered. In February 1981, the claimant notified the respondent by telephone and letter of the hard rock encountered and that an equitable adjustment would be requested. The respondent refused to issue a Change Order, and ordered the claimant back to work.
At the conclusion of the evidence, the parties submitted an agreed stipulation as to compensation for extra work, to which the claimant might be entitled, in the total amount of $326,999.56, which includes $146,186.44 additional compensation for L.R. Skelton & Company and $180,813.12 attributed to the E.J. Koker & Company portion of the claim.
Accordingly, the Court hereby makes an award to the claimant, L.R. Skelton & Company, in the sum of $326,999.56 as additional compensation, and in the sum of $55,203.50 as interest at 6% per an-num from May 7, 1982 (being the 151st day after final acceptance of the project on December 7, 1981).
Award of $382,203.06.